

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*

*One Saint Andrew's Plaza*
*New York, New York  10007*

July 24, 2008

Honorable Gerard E. Lynch
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    **United States v. Tony Duh and Linda Duh**
            **S3 07 Cr. 511 (GEL)**

Dear Judge Lynch:

      The Government received the defendants' sentencing submission in the above-referenced matter last night and responds in anticipation of the sentencing scheduled for tomorrow Friday, July 25, 2008, at 4 p.m. The Government apologizes for the lateness of this submission, but obviously only received the defendants' sentencing submission yesterday evening. The Government respectfully submits that a sentence within the stipulated Sentencing Guidelines range for Tony Duh (70 to 87 months) and Linda Duh (21 to 27 months) would constitute a reasonable sentence and no greater than necessary to meet all the objectives of Title 18, United States Code, Section 3553(a).

**Background to the Investigation**

      In 2005, the New York Drug Enforcement Task Force (the "Task Force") initiated a series of operations designed to dismantle an international narcotics trafficking organization responsible for smuggling tens of millions of dollars worth of illegal drugs across the Mexican border for distribution in the New York City area (the "Organization"). During the course of this investigation, the Task Force obtained information from multiple confidential sources who provided reliable and corroborated intelligence about this Organization. Based on this information and on extensive surveillance conducted by the Task Force agents, the Task Force received Title III authorization from the United States District Court for the Southern District of New York to intercept over forty telephones used by members of the Organization. The Court also authorized the Task Force to install a bug and camera to intercept audio and visual communications in a storefront operation located at 22 West 30th Street, New York, New York, which was used by the Organization to launder its drug proceeds.

      As a result of the information obtained during the investigation, the Task Force arrested 61 individuals engaged in narcotics trafficking and importation and, money laundering. To date, the Gotham City Cases have resulted in the seizure of approximately $6.9 million in narcotics proceeds from various cells within this Organization, at least $5.1 million in property purchased with

Honorable Gerard E. Lynch
July 24, 2008
- page 2 -

illegal proceeds, a $340,000 luxury yacht, and approximately $40,000 in jewelry. With respect to narcotics seizures, the Task Force seized approximately 750 kilograms of cocaine, 11.2 pounds of crystal methamphetamine, and 1,821 pounds of marijuana. The Task Force's efforts also resulted in the seizure of seventeen handguns and five assault rifles.

During the investigation, the Task Force identified Tony Duh and Linda Duh, the defendants, as the owners and operators of "Fine Accessories," the Manhattan storefront used by the Organization to launder narcotics proceeds, which was located at 22 West 30th Street, New York, New York (the "Store"). Initially, the Task Force learned, from a source of information that co-conspirator Salvatore Molina was instructed to deliver an undetermined amount of narcotics proceeds, in the form of United States currency, to an unidentified individual at the Store.[1]

On September 8th, 2006, the Task Force established surveillance in the vicinity of the Store. During the course of that surveillance, a member of the Task Force observed a blue Honda Odyssey minivan (the "Minivan") pull in front of the Store. The agent observed Molina exit the Minivan carrying a gym bag, enter the Store, and meet with a then-unidentified male. He then observed Molina exit the business a few minutes later and depart the area without the gym bag. On September 15th, 2006, based on further information that a narcotics-proceeds money laundering transaction had been planned to take place at the Store again that day, the Task Force again established surveillance in the vicinity of the Store. During the course of that surveillance, the Task Force observed the Minivan pull in front of the Store. The agent observed Molina, who was driving, park the Minivan in front of the Business, exit the Minivan, walk over to the passenger side of the Minivan, and retrieve a green duffle bag from the front seat. The Task Force member, who was dressed in his New York City Police Department uniform, then approached Molina and, after Molina could not answer basic questions about who owned the van and the bag and what the bag contained, asked Molina to open the bag. Molina opened the bag, revealing a large amount of bundled United States currency inside, which was seized and later determined to total approximately $150,000. Molina fled the scene.

Pursuant to the Title III Wiretaps, Task Force intercepted telephone calls occurring on September 15, 2006, before, during and after the encounter between Molina and the uniformed Task Force member. In a number of calls prior to the encounter, Rogelio Beltran-Beltran, a known narcotics trafficker, called the landline telephone located within the Store and spoke with an employee Lucero Leobardo Gomez, notifying Gomez that Beltran-Beltran would

---

[1] Salvatore Molina pled guilty before Your Honor for his participation in the instant money laundering conspiracy. As far as the Government is aware, Molina was involved in at least two money drop-offs totaling between $200,000 and $400,000 at Fine Accessories on September 15, 2006. Molina was sentenced by the Court to 30 months' imprisonment.

Honorable Gerard E. Lynch
July 24, 2008
- page 3 -

be coming.[2] According to judicially authorized audio and video monitoring of the Store, Gomez typically receives the information regarding the deliveries of cash by phone, physically receives the money, announces to Tony Duh and Linda Duh, the defendants, as well as other employees of the Store, the amount of money being delivered and the name of the person with whom the money is associated.

During the encounter between Molina and the uniformed Task Force member, Beltran-Beltran, who was observed arriving at the Store simultaneously with Molina, but in a different vehicle, called Gomez inside the Store, notified Gomez that Molina had been stopped by the police, and asked if Gomez would come out of the Business and take possession of the duffel bag of money. Gomez declined.

After the bag of money had been seized by the Task Force member and Molina had fled, Beltran-Beltran again called Gomez on phone inside the Store. Beltran-Beltran asked whether Gomez had seen the police seize the money; when Gomez said that he had not, Beltran-Beltran asked Gomez to nonetheless respond to any inquiries by stating that the employee had seen the money be seized by the police so that Beltran-Beltran would not get into "trouble." When Beltran-Beltran asked Gomez whether Gomez understood the reason for Beltran-Beltran's request, Gomez responded "Yes, yes, I do understand you. It's your responsibility."

Some time later that evening, in a recorded call, Beltran-Beltran called an unidentified male and explained that the money had been seized. During the course of the conversation, Beltran-Beltran said "Well, if they tell me to pay, I am going to tell them to kill me instead. Because how am I going to pay them? With what money, I don't have any. They should know that it was an accident, they should lower it, or do something. Let's see what happens." Here, the "they" Beltran-Beltran is referring to in this conversation are the owners of the narcotics proceeds, on whose behalf Beltran-Beltran was delivering the drug money to the Store to be laundered.

In the following weeks, members of the Task Force conducted extensive visual surveillance on the Store. During the course of that surveillance, agents observed Tony Duh inside the Store on most of those occasions. In late November 2006, as part of a ruse to view the inside of the Store and to evaluate what type of monitoring equipment could be installed, agents from the Task Force's technical support unit entered the Store in an undercover capacity as workers from the telephone company. Tony Duh greeted them at the door and accompanied

---

[2]     Beltran-Beltran was charged by indictment 06Cr. 1173 (SHS) and pled guilty to narcotics trafficking conspiracy charges before the Honorable Sidney H. Stein and has since pled guilty in matter. Gomez was charged with his participation in a money laundering conspiracy in a separate matter by indictment S1 08 Cr. 32 (SHS). Gomez subsequently pled guilty to money laundering and is awaiting sentence.

Honorable Gerard E. Lynch
July 24, 2008
- page 4 -

them throughout their visit. Tony Duh asked them many questions about why they were there and, based on the training and experience of the agents, appeared to be nervous about their presence within the Store.

In connection with the investigation, the Task Force sought Court authorization to intercept and record by means of closed circuit television cameras, visual, non-verbal communications, occurring within and around the Store. In or about February 2007, pursuant to judicial authorization, agents of the Task Force installed listening devices and video cameras inside the Store, and began to intercept oral communications occurring inside the Store, as well as view visual, non-verbal communications intercepted using video cameras. Pertinent interceptions revealed a consistent pattern of activity within the Store, occurring on a frequent basis. Specifically, Linda Duh, with the assistance of various employees of the Store, supervised the receipt, counting, and subsequent deposit or pick-up of large amounts of U.S. currency. The currency is delivered to the Store by various individuals[3] and counted immediately, or placed in a safe inside the Store controlled solely by Linda Duh for later counting. The currency was typically bundled, sometimes in heat-shrunk plastic, and the bundles are transported in plastic and paper shopping bags — consistently with illegal proceeds being laundered.

During the counting, Linda Duh and other unidentified individuals discussed, among other things, the amounts of currency being counted and the times it would be picked up or delivered. Once counted, the money was then seen being returned to the safe by Linda Duh or being taken from the location by unidentified individuals or employees of the Store. Employees of the Store were observed by members of the Task Force taking large amounts of cash from inside the Store, leaving the premises with the cash in a plastic or paper bag, and delivering the cash to numerous banks where it is deposited in multiple, separate accounts. Various suspicious activity reports were filed by the banks at which the employees of the Store deposited money. According to materials received from the banks relating to those accounts, the address listed on the accounts was the address of the residence of the Duhs in Bayside, Queens. Based upon the intercepted communications taking place inside the Store, as well as the observations of Task Force members who spoke and interacted with Tony Duh in November of 2006, and the observations of Task Force members who observed Tony Duh on the occasion that agents triggered an alarm at the Store, Tony Duh, the defendant, was revealed to be the individual primarily responsible for the activities conducted at the Store. Tony Duh was frequently observed being briefed by Gomez regarding the deliveries of cash to the Store and had been observed fixing and installing a money counting machine inside.

---

[3] In one instance, a man who delivered approximately $300,000 to the Store which money was observed being counted by Linda Duh, the defendant, and another employee of the Store, was subsequently identified as the subject of another Task Force investigation involving the laundering of narcotics proceeds and the distribution of cocaine.

Honorable Gerard E. Lynch
July 24, 2008
- page 5 -

### The Duhs' Arrest

On June 22, 2007, the Task Force executed arrest warrants against Tony and Linda Duh, the defendants. Following his arrest, Tony Duh was advised of his *Miranda* rights, which he waived, and made several post-arrest statements. Tony Duh stated, in substance and in part, that Fine Accessories was used for legitimate business and that his customers paid by check and that the Duhs shipped their goods from the store on 30th Street in Manhattan using UPS and other carriers. Tony Duh admitted to working with numerous Colombian customers who would bring large amounts of U.S. currency to the Store in person and, in exchange, Tony Duh would ship goods to Colombia on their behalf. As the business with the Colombians grew, Tony Duh would receive approximately 12 to 30% commission on goods sold for $80,000 to $90,000 per load. According to Tony Duh , after one of the Colombian ceased coming to the United States because of greed card problems, Tony Duh would meet him in China. This Colombian individual supplied Tony Duh with new customers and Tony Duh paid him a commission.

Tony Duh stated that he had approximately ten to twenty customers from Colombia and Venezuela. The large quantities of cash provided by these individuals were delivered, counted and put in the safe. Tony Duh would wire transfer the money to suppliers of his goods in China. Tony Duh acknowledged that he kept the money in his safe to make the business look smaller and avoid taxes. Tony Duh stated that he traveled to Colombia and saw some of his customers' businesses. Tony Duh admitted that the invoices for his Colombian customers were undervalued in order to minimize the 35% duty charged by the Colombian government. Tony Duh also stated that his Colombian/Venezuelan customers said that they had to "buy" U.S. currency because using traditional banks to wire transfer funds or process checks cost too much; for example, Tony Duh stated that they would have to pay the Colombian government a 2% tax.

In response to a question about whether any of the money was stolen before it reached the store, Tony Duh stated that he did not care — if he did not receive the cash, he did not ship the merchandise. According to Tony Duh , on one occasion, an unidentified male (the "UM") tried to deliver money and they did not receive it.[4] Tony Duh was not at the store at the time. He stated that they learned last minute that the individual was coming; otherwise he would have been there. Tony Duh stated that an employee (Gomez) called him and said that a traffic cop wearing a raincoat took the money before the UM could enter the store. Tony Duh advised the another employee to contact the customer who had sent the UM and advised that he could not ship the goods until he received the money.

Tony Duh related that, sometimes, the U.S. currency arrived without a name. Tony Duh would hold the money until one of his Colombian/Venezuelan customers called to say

---

[4] This is a reference to the incident described above.

they had someone drop off the money. Tony Duh admitted that the U.S. currency was usually brought to the store in black plastic garbage bags, but also in boxes. Sometimes the money was organized well (*i.e.*, sorted by bill size, etc.); other times, it was not. The money was usually wrapped in rubber bands. Sometimes the U.S. currency was in vacuumed sealed bags. Tony Duh stated that he did not question this because he knew that his customers had to "buy" the money. Tony Duh stated that he was just happy to get the money despite how it came, because he owed money in China.

Tony Duh stated that when he filed his personal income taxes he declared approximately $65,000, but in reality, he earned in excess of $200,000 in cash that he did not declare. Tony Duh stated that his wife Linda Duh handled all of the money and he usually only had approximately $100 in his pocket. Of the $7,000,000 in business the prior year, 70-80% ($4,900,000 to $5,600,000) was from his Colombian/Venezuelan customers. Tony Duh stated that his profit was approximately $200,000.

Tony Duh was asked about the source of the funds and he admitted that he had suspicions of where the U.S. currency really came from. He said that he "turned a blind eye" because the business was so good. Tony Duh further stated that he knew accepting the cash was "kind of illegal." Specifically, Tony Duh stated that he suspected/knew that the money was from some illegal source (either drugs or corruption or robberies), though Tony Duh stated he believed that his customers were not involved in the underlying illegal activity, but just bought the U.S. currency.

Following her arrest, Linda Duh was advised of her *Miranda* rights, which she waived, and made several post-arrest statements. Linda Duh stated, in substance and in part, that the large volume of cash from the Colombian/Venezuelan customers was deposited in the BNB BANK branch on 6th Avenue into the "Sun Chain Enterprises" account. According to Linda Duh, the Duhs would use this account to wire transfer money to their suppliers in China. Linda Duh estimated that the Duhs did approximately $2,000,000 in sales to their Colombian/Venezuelan customers during the previous year (2006). Linda Duh stated that they made approximately ten percent profit (approximately $200,000). Linda Duh stated that the people who brought the money in cash were always Spanish speakers and that the money they delivered was sometimes wrapped in plastic. Linda Duh stated that she knew that receiving cash in such large sums and in such a manner (*i.e.*, the currency was bundled and in black plastic bags) was not normal business practice. Linda Duh admitted that she thought the money was associated with narcotics.

Linda Duh stated that, on one occasion, one of their employees (believed to be Gomez above) asked Linda Duh where the money came from. She responded that she did not want him involved, and not to ask any questions. She told him to just give out the address of the store on the phone.

Linda Duh stated that, when it was proposed that they pick up the money outside the store, she told her husband that it was to dangerous and that the money had to be delivered inside the store. She stated that on one occasion an employee (Gomez) went outside the store to pick up money and she told him that he was to never do that again. Duh stated that the Fine Accessories part of the business was the legitimate business, with customers in the United States who paid by check.

### **The Duhs' Pleas**

Following their arrest, both Tony and Linda Duh, the defendants, entered guilty pleas to Counts One and Two respectively of superseding information S3 07 Cr. 511 (GEL) (the "Information"), pursuant to plea agreements with the Government.

On December 6, 2007, Tony Duh pled guilty to Count One of the Information, which charged the defendant with conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 1956(h). Count One of the Information carries a maximum penalty of 20 years' imprisonment, a maximum term of 3 years' supervised release, a maximum fine of the greater of $500,000 or twice the value of the property involved in the money-laundering activity, whichever is greater, and a mandatory $100 special assessment. As part of his plea agreement with the Government, the defendant stipulated that his Sentencing Guidelines range is calculated as follows:

1. Pursuant to U.S.S.G. § 2S1.1(a)(2), the applicable base offense level for Count One of the Indictment is 8.

2. Because the defendant participated in a money laundering conspiracy involving more than $7,000,000 but less than $20,000,000, an enhancement of 20 levels is warranted, pursuant to U.S.S.G. § 2B1.1(b)(1)(K).

3. Because the defendant is pleading guilty to violating 18 U.S.C. § 1956, a 2-level increase is warranted, pursuant to U.S.S.G. § 2S1.1(b)(2)(B).

4. Assuming the defendant clearly demonstrates acceptance of responsibility, through his allocution and subsequent conduct prior to the imposition of sentence, a 2-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(a). Furthermore, assuming the defendant accepts responsibility as described in the previous sentence, an additional 1-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(b), because the defendant will have given timely notice of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

5. In accordance with the above, the Guidelines offense level for Count One of the Information is 27, assuming the defendant accepts responsibility as described above.

  6. As the defendant is in Criminal History Category I, his resulting Sentencing Guidelines range is 70 to 87 months. At Guidelines level 27, the applicable fine range is $12,500 to $500,000.

  The plea agreement between Tony Duh and the Government also included an agreement as to criminal forfeiture in this case, including a $10,000,000 money judgement and the forfeiture of various bank accounts and property. Thought the parties agreed that a sentence within the stipulated Guidelines range of 70 to 87 months would constitute a reasonable sentence in light of all of the factors set forth in Title 18, United States Code, Section 3553(a), the parties agreed that either party may seek a sentence outside of the 70 to 87 month range, based upon the factors to be considered in imposing a sentence pursuant to the 3553(a) factors. The defendant further agreed not to appeal or otherwise collaterally attack any sentence within or below the 70 to 87 month range.

  On December 6, 2007, Linda Duh pled guilty to Count Two of the Information, which charged the defendant with misprison of a felony, in violation of Title 18, United States Code, Section 4. Count Two of the Information carries a maximum sentence of three years' imprisonment; a maximum fine of the greatest of $250,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to persons other than the defendant resulting from the offense; a maximum term of supervised release of one year; and a mandatory $100 special assessment. As part of her plea agreement with the Government, the defendant stipulated that his Sentencing Guidelines range is calculated as follows:

  1. U.S.S.G. § 2X4.1 applies to the conduct charged in the Information and provides for a base offense level that is 9 levels lower than the offense level for the underlying offense, but in no event less than 4 or more than 19. The underlying offense is a conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), as charged in the Indictment. Pursuant to U.S.S.G. § 2S1.1(a)(2), the base offense level for the underling offense is 8. Because the underlying offense involved more than $7,000,000 but less than $20,000,000, an enhancement of 20 levels is warranted, pursuant to U.S.S.G. § 2B1.1(b)(1)(K). Because the underlying offense is a violation of 18 U.S.C. § 1956, a 2-level increase is warranted, pursuant to U.S.S.G. § 2S1.1(b)(2)(B). Accordingly, pursuant to U.S.S.G. § 2X4.1, as the base offense level for the underlying offense is 30, the base offense level for the instant offense is adjusted to19.

  2. Assuming the defendant clearly demonstrates acceptance of responsibility, through her allocution and subsequent conduct prior to the imposition of sentence, a 2-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(a). Furthermore, assuming the defendant accepts responsibility as described in the previous sentence, an additional 1-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(b), because the defendant will have given timely notice of her intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

Honorable Gerard E. Lynch
July 24, 2008
- page 9 -

        3.    In accordance with the above, the Guidelines offense level for Count Two of the Information is 16, assuming the defendant accepts responsibility as described above.

        4.    As the defendant is in Criminal History Category I, her resulting Sentencing Guidelines range is 21 to 27 months. At Guidelines level 16, the applicable fine range is $5,000 to $50,000.

        The plea agreement between Linda Duh and the Government also included an agreement that Linda Duh would not contest the civil or criminal forfeiture of any and all assets specified in the forfeiture allegation in the Information, including the $10,000,000 money judgment and the forfeiture of various bank accounts and property. Though the parties agreed that a sentence within the stipulated Guidelines range of 21 to 27 months would constitute a reasonable sentence in light of all of the factors set forth in Title 18, United States Code, Section 3553(a), the parties agreed that either party may seek a sentence outside of the 21 to 27 month range, based upon the factors to be considered in imposing a sentence pursuant to the 3553(a) factors. The defendant further agreed not to appeal or otherwise collaterally attack any sentence within or below the 21 to 27 month range.

## The Pre-Sentencing Investigation Reports

        Following the defendants' guilty pleas, pre-sentencing investigation reports (the "PSRs") were prepared by the United States Probation Office in anticipation of the defendants' sentencings. The PSRs each respectively calculated Tony Duh and Linda Duh's Sentencing Guidelines range in a matter consistent with the calculations contained in their plea agreements with the Government. Accordingly, based on the PSRs, Tony Duh faces a Sentencing Guidelines range of 70 to 87 months' imprisonment, and Linda Duh faces a Sentencing Guidelines range of 21 to 27 months' imprisonment. In its recommendations, the Probation Office recommended sentences at the bottom of each defendant's respective ranges.

## The Defendants' Sentencing Submission

        On July 22, 2008, the Government received various exhibits to the defendant's sentencing submission (with cover letter dated July 20, 2008). These exhibits included various photographs related to the Duhs' various businesses (Exhibit A); a forensic psychological report of Anthony Duh, the Duh's 15-year-old son (Exhibit B); and various letters from the Duhs' family and friends (Exhibit C). On June 23, 2008, the Government received the defendants' sentencing letter. Therein, the defendants seek a variance from the stipulated Sentencing Guidelines ranges which would result in "protracted period of home incarceration" for Tony Duh and a "non-incarceratory sentence of probation" for Linda Duh. The Government respectfully submits that these sentences are unreasonable and inconsistent with all the tenants of Title 18,

Honorable Gerard E. Lynch
July 24, 2008
- page 10 -

United States Code, Section 3553(a), and that sentences within the Guidelines ranges (stipulated by the parties to be both accurate and reasonable) are appropriate in this case.

## Argument

Based upon the defendants' sentencing submission, it appears that the defendants are seeking non-Guidelines sentences (indeed non-incarceratory sentences) for effectively two reasons: (1) their family circumstances; and (2) the "colossal, nearly insurmountable amount of money" which will be owed as criminal forfeiture. The Government respectfully submits that neither point supports a non-Guidelines sentence, and also respectfully disagrees with some of the general characterizations contained in the defendants' letter. The Government respectfully requests that the Court impose sentences within the Guidelines range of 70 to 87 months for Tony Duh and 21 to 27 months for Linda Duh, as set forth in the PSRs, which are sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

    **A.**    **The Court Should Carefully Consider The Guidelines In This Case Because The Guidelines Ranges are Reasonable.**

The United States Sentencing Guidelines were enacted to ensure uniformity in sentencing across the nation and among judges within a single judicial district. 18 U.S.C. § 3553(a)(6); *United States* v. *Booker*, 125 S. Ct. 738, 757, 759-61 (2005) and *United States* v. *Crosby*, 397 F.3d 103, 112 (2d Cir. 2005). Although the Guidelines are no longer mandatory, the Second Circuit has instructed District Courts to consider them "faithfully" when sentencing. *Crosby*, 397 at 114. The Second Circuit has made clear that "'[t]he guidelines cannot be called just "another factor" in the statutory list, 18 U.S.C. § 3553(a), because they are the only integration of the multiple factors and, with important exceptions, their calculations were based upon the actual sentences of many judges.'" *United States* v. *Rattoballi*, 452 F.3d 127, 133 (2d Cir. 2006) (quoting *United States* v. *Jimenez-Beltre*, 440 F.3d 514, 518 (1st Cir. 2006) (*en banc*)). The Supreme Court recently expressed a similar view in *Rita* v. *United States*, 127 S. Ct. 2456 (2007). In concluding that courts of appeals may apply a rebuttable presumption of reasonableness to sentences within the Guidelines range, the Court observed that the advisory Guidelines range reflects the considered judgment of the Sentencing Commission, after examining "tens of thousands of sentences and work[ing] with the help of many others in the law enforcement community over a long period of time" in an effort to fulfill the same objectives set out in Section 3553(a). *Id.* at 2464.

As the Guidelines "seek to embody the § 3553(a) considerations, both in principle and in practice," the Guidelines "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Id.* at 2464-65. Two of those objectives, specifically, the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, *see* 18 U.S.C. § 3553(a)(2)(A), and the need to afford adequate deterrence to criminal conduct, *see* 18 U.S.C. § 3553(a)(2)(B), support a Guidelines sentence here. In addition, the

Honorable Gerard E. Lynch
July 24, 2008
- page 11 -

Guidelines range is appropriate here to ensure that the defendant is treated similar to others convicted of the same crime with the same history, thus avoiding "unwarranted sentence disparities." 18 U.S.C. § 3553(a)(6).[5]

      B.      **The Defendants Are Not Entitled To Non-Guidelines Sentences Based on Their Unfortunate, Thought Not Unusual Circumstances.**

      As a preliminary matter, the Government states that it does not wish to diminish in any way the significant impact that the defendants' criminal conduct and any resulting sentence of incarceration could have upon their family, and specifically, their 15 year old son. These circumstances are indeed sympathetic, but they are neither unusual nor singularly tragic (as often can be the case, based on different facts than those here), nor do these circumstances arise from *anything* other than the defendants' own willful, knowing, and illegal choices — choices motivated exclusively by financial gain.

      The Sentencing Guidelines do address a defendant's family circumstances and, in fact, the Guidelines strongly discourage downward departures based on such circumstances in the majority of cases. Section 5H1.6 of the Sentencing Guidelines provides that "[f]amily ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted." U.S.S.G. § 5H1.6. The Guidelines thus discourage departures on the basis of family circumstances and therefore, under the Guidelines, a departure is appropriate based on such circumstances "only 'in exceptional cases,'" *Koon* v. *United States*, 518 U.S. 81, 95-96 (1996) (quoting U.S.S.G. ch. 5, part H, intro. comment.), and "only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present." *Id.* at 96; *see also United States* v. *Walker*, 191 F.3d 326, 338 (2d Cir. 1999) (family circumstances departures "must be reserved for situations that are truly extraordinary"); *United States* v. *Faria*, 161 F.3d 761, 762 (2d Cir. 1998) (same).

      The Second Circuit has repeatedly emphasized that "[d]isruption of the defendant's life, and the concomitant difficulties for those who depend on the defendant, are inherent in the punishment of incarceration." *United States* v. *Johnson*, 964 F.2d 124, 128 (2d Cir. 1992). Accordingly, family circumstances departures have been limited to extraordinary situations "where the family was uniquely dependent on the defendant's ability to maintain existing financial and emotional commitments." *Faria*, 161 F.3d at 762 (quoting *United States* v. *Sprei*, 145 F.3d 528, 535 (2d Cir. 1998)).

---

      [5]      On the issue of sentencing disparities, the Court should consider that Salvatore Molina, who was a courier who delivered money to the Duhs' money laundering operation on two occasions, received a Guidelines sentence of 30 months. The Government submits that Molina's conduct was far less significant than that of the Duhs who ran this money laundering enterprise for many years.

Honorable Gerard E. Lynch
July 24, 2008
- page 12 -

The factor that repeatedly has been held to distinguish truly extraordinary family hardship from the burden ordinarily visited upon the defendant's family as a result of the defendant's incarceration is the absence of adults available to act as care-takers for the defendant's dependents in the defendant's stead. *See*, *e.g.*, *Sprei*, 145 F.3d at 535 (requiring "unique" dependence on defendant); *United States* v. *Jaderany*, 221 F.3d 989, 996 (7th Cir. 2000) ("a defendant's ability to rely on a supportive spouse or other relatives to look after his children makes his case for a downward departure less compelling"); *United States* v. *Dyce*, 91 F.3d 1462, 1467-68 (D.C. Cir. 1996) (reversing departure for "single mother with three children under the age of four years old, one of whom is three months old and is breast fed by the defendant," where other adults available to care for the children).

While a defendant's family circumstances are appropriately considered by the Court pursuant to Section 3553(a), as part of the history and characteristics of the defendant, it is the Government's position that here, the defendants' family circumstances do not warrant a sentence below the applicable Sentencing Guidelines ranges for either Tony or Linda Duh. According to the defendants' submission, the defendants are the primary providers for Anthony Duh, their 15 year old son, while their older daughter is away at college. According to the report provided by the defense (Exhibit B to the sentencing submission), Anthony Duh is a top student at Bronx High School of Science involved in a number of extra-curricular activities such as swimming, tennis, piano classes, and a member of the Boy Scouts of America and the Flushing Buddhist Temple. While the report makes clear that Anthony Duh has had a psychological reaction to his parents' arrest (including depression and anxiety), the Government respectfully submits that this can hardly be unexpected, nor does it rise to the level of "extraordinary" to justify giving the Duhs a break (and certainly not a significant one) on their sentences. Without diminishing the impact that the defendants' criminal conduct (and their resulting prosecution) has had upon Anthony Duh, this is not a situation where there are (1) one or more dependant infants facing homelessness if both parents are incarcerated; (2) special needs children, with learning or psychosocial disabilities wholly unrelated to their parents' criminal predicament; or (3) a lack of family or friends who can assist in their care. Your Honor has no doubt seen such truly tragic scenarios, where individuals have no family or social support network and where incarceration of both parents would lead to foster homes or some other state intervention — situations where immigrant parents have no one to help, and their child or children are more than a decade away from emancipation.

Respectfully, this is hardly such a situation. Anthony Duh, while no doubt traumatized by the realization that his parents were engaged in criminal conduct and may face significant periods of incarceration, is by all accounts an otherwise stable and normal 15-year old boy. The defense's psychoanalysis report provided as Exhibit B does not illuminate *any* reaction or special circumstances which makes his parents' incarceration singularly devastating. Further, as demonstrated by the voluminous and thoughtful letters provided by the defense as Exhibit C, the Duhs have established a large and supportive network of financially stable family and friends

Honorable Gerard E. Lynch
July 24, 2008
- page 13 -

who could no doubt assist in the care of Anthony Duh during the period of his parents' (presumably overlapping) incarceration. In this regard, in addition to Anthony's older sister, the Duhs appear to have numerous relatives and friends in the area, not to speak of the number of relatives in China, who possibly could assist in caring for Anthony.[6] Notably, when it came time for Tony and Linda Duh to post bail in this case, there were a number of anxious candidates with significant financial resources willing to put up homes, businesses, and cash, in order to help secured the Duhs' release from custody. It seems very unlikely, based on that fact and all the letters provided by the defense, that Anthony Duh will not have the social and financial support necessary to help him through this undoubtedly difficult time.

    Accordingly, the defendants' family circumstances, therefore, do not provide a basis for a non-Guidelines sentence. Unquestionably, the defendants' incarceration will be financially burdensome and emotionally distressing for their family. But in this, they are no different from any defendant who participated in such a massive money laundering operation and therefore faces a significant prison term. Such lengthy terms are consistent with the goals set forth in Section 3553(a) – to provide just punishment for a defendant's conduct, to promote respect for the law and to provide deterrence to future criminal conduct, both on the part of these defendants, and others. A family-circumstances based departure or variance would undermine these goals, and would also undermine the goal that defendants that are similarly situated with respect to their criminal conduct, criminal histories, and other characteristics serve comparable sentences.

    C.  **The Defendants Are Not Entitled To Non-Guidelines Sentences Based on the Significant Forfeiture Order in this Case.**

    The defendants submission relies heavily upon the notion that the significant and appropriate forfeiture obligation agreed to by the defendants in their plea agreements should be considered by the Court to "offset" the notion of incarceration. The Government respectfully submits that this is not appropriate and, while all the defendants' personal characteristics are properly considered by the Court under Section 3553(a), the fact that the defendants' criminal conduct has given rise to a substantial forfeiture obligation, is not compelling. The defendants engaged in an extensive criminal money laundering conspiracy which lasted from 1999 through

---

  [6]  For example, included in Exhibit C, are letters from various friends and family: Alice Chen, Tony Duh's neice, who is a CPA and senior auditor for Deloitte & Touche, in Wyncote, Pennsylvania, who spends her holidays with the Duhs; Pi Vin Chen Lee, Linda Duh's mother and Anthony Duh's *grandmother*, who lives in Islip, New York; Sheree Shu, the Duhs' niece who is very close with her uncle and aunt (and no doubt her cousin Anthony); Serina Ho, the mother of Anthony Duh's classmate, who knows Anthony well; David Cheng, Linda Duh's brother, who lives in Islip, New York; and numerous other friends who seem quite devoted to the Duhs.

their 2007 arrest — and through which millions and millions of illegal drug dollars were laundered. In his post arrest statement, Tony Duh admitted to efforts made to minimize his financial exposure and shield himself (and no doubt his businesses) from income tax liability. Criminal forfeiture is wholly appropriate, and should not be used to justify lessening the penalties Tony and Linda Duh face for their crimes.

Also, it is important to clarify one significant statement made by the defense in the sentencing submission. While Tony Duh has agreed to forfeit (and Linda Duh has agreed not to contest the forfeiture of) $10,000,000 as a money judgment, the Government has agreed that the forfeiture of the Manhattan property which housed the Store — a specified item in the forfeiture allegation and in the plea agreements — would offset, in part, the $10,000,000 money judgment — rather than be independently forfeited, which is permissible (and appropriate) under the law. Recently, though counsel, the Government has learned from defense counsel that there exists potential buyers of the property who are willing to purchase if for upwards of $6 to $7 million. While this deal has not yet been completed, and while the balance would still be a significant sum (reduced, of course, by the significant quantity of cash already frozen), it would be incorrect for the Court to think that the Duhs face a $10,000,000 debt *after* all their assets have been depleted. This is not the case. Similarly, the Court should also be aware that, as part of the plea negotiations in this case, the Government agreed to let the Duhs keep the home in which they live and one of their vehicles, despite the fact that they are appropriately forfeitable in this case. The goal there, obviously, was not to leave the Duhs without some means as a family and to protect their son Anthony from becoming homeless because of his parents' criminal activity.

The Government submits that the defendants' sentences should not be reduced because of the criminal forfeiture agreed to in this case.

> D. **The Defendants Minimize and Downplay the Significance of Their Criminal Conduct in the Hopes of Non-Guidelines Sentences.**

The defendants' sentencing submission is consistent with the terms of their respective plea agreements which explicitly permit both defendants to seek non-Guidelines sentences. The Government takes issue, however, with some aspects of the defendants' sentencing submission as they tend to minimize the significance of the defendants' criminal activities.

For example, in seeking a substantial (70 month) variance from low end of his Guidelines range, Tony Duh shares how hard he has worked in his businesses and postulates that "a typical money launder does not slave at his job fifteen hour days." Considering the number of legitimate businesspeople who engage in the crime of money laundering, the Government submits this is neither accurate nor relevant. The defendant further suggests that he has "taken corrective business measures," including not accepting cash and made a "grave mistake trusting

Honorable Gerard E. Lynch
July 24, 2008
- page 15 -

other people who misrepresented themselves and their intentions." These statements clearly imply that Tony Duh's criminal conduct arose from negligence, carelessness, or some other poor business practices, or that he was duped by others into participation in his crime. On the contrary, as demonstrated, at a minimum, by his post-arrest statement and his plea allocution, over many years, the defendant knowingly engaged in numerous financial transactions designed to conceal the fact that the money involved was from illegal sources, and that he did so knowing that such conduct was against the law. Any attempt to blame this willful, knowing, and intentional illegal activity on poor business practices or, worse yet, misplaced trust, is pure minimization and demonstrates a lack of acceptance of responsibility. The Duhs illegal money laundering operation was motivated exclusively by financial gain — they were aware of the illegality of the money they were laundering and did so nonetheless, in exchange for significant commissions.

With respect to Linda Duh, obviously the defense is correct that Linda Duh has been convicted of misprison of a felony, rather than of the money laundering conspiracy with which she was originally charged. In her sentencing submission, however, Linda Duh characterizes her criminal conduct exclusively as "having discovered that her husband was participating in money laundering activities and not having reported the same to authorities." The Government respectfully submits that while the defendant's plea agreement provided her with a significantly lower Guidelines exposure and a radically reduced statutory maximum than that which she would be facing if she was convicted of a money laundering conspiracy, her plea offer does not change her underlying conduct. As demonstrated by the evidence in the case, her post-arrest statements, (not to mention the findings of a federal grand jury in this District), Linda Duh was not merely the "knowing" spouse of a money launderer. Linda Duh was an active and knowing member of the money laundering operation and her plea offer to a misprison of a felony should not be considered by the Court as a reflection of the evidence against her, but rather an offer based in an attempt to address some of the very same family circumstances issues raised in the defendants' sentencing submission. Accordingly, despite the connotations of the defendant's submission, as well as some of the references made by her family members unaware of the evidence in the case, Linda Duh was not coerced, "dragg[ed along" or "giv[en] too much pressure" by her husband. Her illegal activity is exclusively her own responsibility.

Honorable Gerard E. Lynch
July 24, 2008
- page 16 -

## Conclusion

  For all of the foregoing reasons, the Government submits that a non-Guidelines sentence for either Tony or Linda Duh is not supported by facts of this case, nor the arguments raised by the defendants in their sentencing submission. Accordingly, the Government respectfully requests that the Court sentence the defendants within their respective, stipulated Sentencing Guidelines ranges.

                Respectfully submitted,

                MICHAEL J. GARCIA
                United States Attorney
                Southern District of New York


       By: _____
          Glen G. McGorty
          Assistant United States Attorney
          212-637-2505

cc: Michael Musa-Obregon, Esq.
   Counsel for Tony Duh
   177 Outwater Lane
   Garfield, NJ 07026
   (973)-253-7474/(973)-253-8030 (fax)

   Telesforo Del Valle, Esq.
   Counsel for Linda Duh
   445 Park Avenue, 14th Floor
   New York, NY 10022
   (212)-481-1900/(212)-481-4853 (fax)